2016 IL App (2d) 140294
No. 2-14-0294
Opinion filed March 30, 2016

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 12-CF-205 |
| SCOTT GREGORY, | ) ) ) | Honorable Timothy J. McCann, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices Jorgensen and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant, Scott Gregory, appeals his convictions of one count of threatening a public

official (720 ILCS 5/12-9(a)(1)(i) (West 2010)) and three counts of cyberstalking (720 ILCS

5/12-7.5(a)(1), (a-3)(1), (a-3)(2) (West 2010)).  He contends that the trial court erred by allowing

into evidence 10 letters containing references to other crimes and prior bad acts, which he argues

were not relevant and were highly prejudicial.  We reverse and remand for a new trial.

¶ 2                                     I. BACKGROUND

¶ 3     Defendant was indicted on one count of threatening a public official and three counts of

cyberstalking in connection with e-mails sent to Brian LeClercq, the president of the Village of

Oswego; the Oswego police department; and Oswego police officer Matthew Unger. The e-mails were sent by "John Doe" with the e-mail address hoodbox@yahoo.com.

¶ 4 Four e-mails were sent to the Oswego police department or Unger. The first e-mail was sent on January 31, 2012. The subject line was "oswego policemen are faggot poices [*sic*] of shit." The body of the e-mail stated:

> "did I just say that? want to hear a story about a bunch of faggot bullies who picked on someone who wasn't a criminal, kept to himself, and yet still got picked on by a bunch of pussies hiding behind their badge, you are nothing but cowards. i'm so glad my lying ex got away with stalking me, lying about me, and ruining my life. i prey [*sic*] something to happen to your families while you are at work. karma is a bitch ……….. at least no one was home at my house when someone was inside of it LOL"

¶ 5 The second e-mail was sent on February 14, 2012. The subject line was "dear occifer unger," and the body of the e-mail stated: "how is stephanie unger doing? hmmmmmmmmmmmmmmmmmmmmm."

¶ 6 The third and fourth e-mails were sent on February 15, 2012. The subject line of the third e-mail was "HI." The body of the e-mail stated: "Do you think I'm going to let this go? First you losers destroy the first part of my life just to turn around and help out doing it again because some lying whore? Lock me up, find out how it doesn't go away cause when i get out, i'll still do it."

¶ 7 The fourth e-mail had the subject "HI Unger." The body of the e-mail stated: "I will be letting this police department as well as him know you are the reason why too. Don't think I don't know what you did so I guess we'll see how well that turns out. All in all, I'm just trying

to help my own family out." Also on February 15, 2012, Unger received a similar voice mail message.

¶ 8    Two e-mails were directed at LeClercq and sent to the general e-mail address for the Village of Oswego. The first was received on February 10, 2012, with the subject line "please forward this to the mayor." The e-mail stated: "let him know i'll be coming for him at his personal residence when i get back to town." The second e-mail was sent on April 20, 2012, and stated:

> "When the mayor's kids don't show up at home, do you think he'll ignore that as well? Life's a bitch when it catches up to you and since the police in Oswego think they have the right to trespass onto private property and LIE, then I guess I am allowed to do whatever I want to satisfy what I went through. You were asked to call me but chose not to."

¶ 9    Before trial, defendant moved *in limine* to bar evidence of prior bad acts, including 10 handwritten letters he sent to the Oswego police department and to the "Captain" of the Oswego police department from December 2012 through March 2013, while he was in jail following his arrest. The State also filed a motion *in limine*, seeking to admit the letters. The letters were lengthy and often contained profanity, which was sometimes in larger writing for emphasis. They also contained large amounts of derogatory and homophobic language. The letters referred to topics such as defendant's lack of friends, his belief that his parents and others lied to him, and his depression. Although they were often unclear, the general themes of the letters appeared to be defendant's beliefs that the charges against him were baseless and that the police lied to him or conspired against him, his intent to bring a lawsuit against them, and his demands for a monetary settlement. The letters also referred to other crimes, bad acts, and facts that could

place defendant in a bad light. For example, there were references to allegations of domestic violence, including defendant's pulling a knife on a woman; a restraining order obtained by defendant's ex-girlfriend; a coworker's belief that defendant was a pedophile; 25 traffic tickets; defendant's being pulled over 50 times; his payment of fines; his losing his driver's license; his losing jobs and dropping out of college; accusations that defendant was a drug dealer and gun runner; and his purposely failing a drug test to get some time off. In what appeared to indicate an understanding that the letters could be viewed as threats like those in the e-mails that he allegedly sent, defendant sometimes specifically stated that the letters were not threats. He also repeatedly offered to take a polygraph test.

¶ 10    At the hearing on the motions, defense counsel argued that the letters were not relevant, as they dealt with defendant's demands for a settlement from the Oswego police department and were unrelated to the threats made to the victims in the case. Counsel further argued that the letters were not relevant to show *modus operandi*, motive, intent, or any other proper fact. Counsel then argued that, even if the letters were relevant, they were more prejudicial than probative, because of the inference of criminal propensity. The State primarily argued that the letters were admissible as admissions of online activity and to show a continuous course of conduct or *modus operandi*.

¶ 11    In a written order, the trial court stated that it had reviewed the letters, that it had considered the probative value and the prejudicial effect, and that it would admit the letters. The court referred to 9 letters, but the record contains 10. The order does not identify the purpose for which the court found the letters to be relevant; *i.e.*, motive, intent, identity, etc. The court excluded a number of other items that the State sought to introduce.

¶ 12    In December 2013, a jury trial was held.  Unger testified that, in July 2010, he did a well-being check on defendant at defendant's parents' home in Oswego, during which he convinced defendant to go to the hospital for a psychological evaluation.  A month later, he had a phone conversation with defendant, who was upset because he was unable to pay his hospital bill.  Unger called the hospital to see if there were any programs that could help defendant pay the bill.  In 2012, Unger was made aware of the e-mails that were sent to the police department.  He testified that the e-mail referencing his wife made him angry and that he was extremely concerned for the safety of his wife and child after reading it.  The voice message also made him feel extremely concerned for his family.  LeClercq testified that the e-mails sent to him through the village e-mail address made him pretty uncomfortable and very concerned.

¶ 13    The e-mails were put into evidence.  Other evidence showed that the hoodbox@ yahoo.com e-mail address listed scott_gregory@att.net under other identities.  The billing address for the account listed defendant at an address in Oswego that had utilities in defendant's name from September 2007 until October 2012.  Between January 15 and February 15, 2012, the account was accessed exclusively from an IP address that was registered to Stephen Gregory in North Carolina.  When defendant was arrested, he gave officers the North Carolina address, and his list of approved visitors included his parents, Stephen and Lorraine Gregory, at the same address.

¶ 14    Joe Gillespie, the deputy commander of the corrections division of the Kendall County sheriff's office, testified about the 10 letters that were the subject of the motions *in limine*, which were marked as exhibits 13 through 21 and exhibit 33.  He testified that letters may be read by jail staff before they are sent and that any letters that raise issues are copied before they are mailed.  He said that defendant sent the 10 letters and that copies were made.  Detective Terry

Guisti of the Oswego police department identified the letters and read aloud the following sentence from exhibit 13: "I'm so glad you assholes were watching me online." Guisti believed that this excerpt meant that defendant was aware that the police were picking up information that he was putting on the Internet. Guisti also read aloud the following portion of exhibit 33: "The governor of this state whose name is attached to a bullshit warrant is sure to vent his frustration through your department, the Kendall County Sheriff's Office, through Eric Weis and probably the spineless mayor you convinced to lie after violating my privacy rights and overstepping your jurisdiction by observing my online activity." Guisti interpreted this to mean that defendant was upset that the police were picking up information that he was putting on the Internet. The 10 letters were admitted into evidence over defendant's objection.

¶ 15    During closing argument, the State referenced the letters and read from one the statement, "this is not a threat at all, this is not going away. This will end in my terms. This anger isn't going away. Find out how it doesn't go away 'cause when I get out, I'll still do it." It read from another: "I'm so glad I lost everything because of some fat cop leaves some lying whore thrown out of my apartment." The State argued that these statements were similar to those in the e-mail messages that referred to a "lying whore" and stated that the author was not going to let the matter go. Responding to the State's arguments, defense counsel asked the jury to read the letters and see that they were written by someone who was frustrated and believed that his rights had been violated. Counsel argued that they were not evidence of the threats or harassment contemplated by the charges against defendant. In rebuttal, the State again referenced the letters, arguing, "defendant can't even help himself, he keeps writing letters. And he keeps admitting following me online."

¶ 16    After the case was submitted to the jury, the parties discussed the evidence that would be sent to the jury during deliberations.  In regard to the 10 letters, the following colloquy occurred:

"THE COURT: 13 through 21 are all letters.  Do you want those to go back?

[THE STATE]: Yes. We are offering—I know counsel is gonna have an objection.

[DEFENSE COUNSEL]: Well, I have my same objection since the motion in limine, but no objection—

(overlapping conversation.)

THE COURT: Without waiving your prior objections, I'll send them back."

The court also referred to admitting exhibit 33 over the "[s]ame objection previously stated."

¶ 17    The jury found defendant guilty.  Defendant moved for a new trial, arguing in part that the court erred in admitting the letters.  That motion was denied, and defendant was sentenced to three years' incarceration.  He appeals.

¶ 18                                II. ANALYSIS

¶ 19    Defendant contends that the trial court erred in allowing the letters into evidence and sending them to the jury.  The State argues that defendant invited the error or forfeited his argument by consenting to the admission of the letters in their entirety and failing to ask for parts of them to be redacted, especially when the parties discussed the items that would be sent to the jury. We disagree.

¶ 20    The State moved *in limine* to offer the letters in their entirety, and defense counsel vigorously objected to that throughout the entire process.  When the letters were sent to the jury, the court specifically stated that the defense was not waiving its previous objections.  Defense counsel then raised the issue again in the motion for a new trial.  The State, as the proponent of

the evidence, had the burden to demonstrate the relevance of the letters. See *Hawn v. Fritcher*, 301 Ill. App. 3d 248, 254 (1998). To require the defense to specifically ask for portions to be redacted when the State sought to introduce the letters in their entirety would force counsel to concede that some portions were admissible—something that would be counter to defense counsel's argument that none of the material in the letters was relevant. It would also improperly place the burden on defendant to assist the State in properly presenting its evidence. See *People v. Lampkin*, 98 Ill. 2d 418, 430 (1983) (stating in another context that the State's Attorney's duty to safeguard the rights of the people extends to one accused of a crime and that the failure to delete prejudicial and improper matters from a statement is a violation of that duty). Although defense counsel in closing argument asked the jury to read the letters, that was after the court had ruled that the letters were admissible and was in response to the State's arguments about them. Given that defendant clearly objected to the admission of the letters, and as the court was fully aware of the arguments as to why they should not be admitted, defendant did not invite error or forfeit his argument.

¶ 21    As to the admission of the letters, the question is whether they were relevant and, if so, whether they were more prejudicial than probative. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). To establish the relevance of a piece of evidence the proponent must: (1) identify the fact that it is seeking to prove with the evidence; (2) explain how that fact is of consequence; and (3) show how the evidence tends to make the existence of this fact more or less probable than it would be without the evidence. *People v. Maldonado*, 402 Ill. App. 3d 411, 418 (2010).

¶ 22    Defendant first argues that the letters were not relevant to show anything other than a propensity to commit crimes or behave badly. The State contends that the letters were relevant to show identity and intent to harass. At trial, the State also argued that the letters were relevant to show *modus operandi* and a general course of conduct, but it has not argued those points in its brief on appeal.[1]

¶ 23    "Other-crimes evidence encompasses misconduct or criminal acts that occurred either before or after the alleged criminal conduct for which the defendant is standing trial." *People v. Johnson*, 2013 IL App (2d) 110535, ¶ 61. "Other-crimes" evidence does not pertain solely to prior convictions; the term encompasses bad acts, and the standard for the admissibility of such evidence is more than mere suspicion, but less than beyond a reasonable doubt. *People v. Colin*, 344 Ill. App. 3d 119, 126 n.2 (2003).

¶ 24    Other-crimes evidence is admissible to prove any material fact relevant to the case, but it is inadmissible if it is relevant only to demonstrate the defendant's propensity to engage in criminal activity. *Johnson*, 2013 IL App (2d) 110535, ¶ 61. "Such evidence may be admissible when it is relevant to show, among other things, motive, intent, identity, absence of mistake or

---

[1] Neither course of conduct nor *modus operandi* is particularly applicable. A course of conduct generally contemplates intrinsic acts that are a necessary preliminary to the current offense and are part of the course of conduct leading up to the crime charged. See *People v. Hensley*, 2014 IL App (1st) 120802, ¶ 51. *Modus operandi* requires a high degree of similarity between the crimes. *People v. Wilson*, 214 Ill. 2d 127, 140 (2005). Here, the letters were written after the crimes were charged and did not involve the same form of communication. Further, the other crimes referenced in the letters were completely unrelated to the e-mail communications at issue.

accident, *modus operandi*, or the existence of a common plan or design." *Id*.; see Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). "However, relevant other-crimes evidence may yet be excluded if its prejudicial effect substantially outweighs its probative value." *Johnson*, 2013 IL App (2d) 110535, ¶ 61. "The admissibility of other-crimes evidence is committed to the sound discretion of the trial court, and its decision will not be disturbed absent a clear abuse of discretion." *People v. Null*, 2013 IL App (2d) 110189, ¶ 43. "An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court." *Id*.

¶ 25    The portions of the letters that Guisti read out loud to the jury had some relevance to the issue of identity. The statements indicating that defendant was aware that the police were monitoring his online activity could be viewed as an admission that he engaged in questionable activities online. During closing, the State referenced the statement, "this is not a threat at all, this is not going away," and referenced language that was similar to language in the e-mails and concerned a similar topic. Taken together, these statements were relevant to show identity, as they were circumstantial evidence that defendant sent the e-mails and knew that they were being viewed as threats. Had that been the extent of the use of the letters, there would not have been an abuse of discretion on the part of the court in admitting them. The problem, however, is that the letters in their entirety were admitted, and those letters contained large amounts of other-crimes evidence that the State does not even argue was relevant.

¶ 26    When evidence of unrelated offenses is contained in an otherwise competent statement, it must be deleted before the statement is provided to the jury, unless to do so would seriously impair its evidentiary value. *People v. Moore*, 2012 IL App (1st) 100857, ¶ 48. Here, the deletion of the evidence of unrelated offenses would have done nothing to interfere with the

State's use of the letters. However, because that use was so minimal, and because the evidence of unrelated offenses was so voluminous and inflammatory, there was a great risk that the jury would find defendant guilty of the charges in light of his propensity, or that it would find defendant guilty not of the charges but instead of one of the uncharged acts. In sum, the letters' prejudicial effect overwhelmed their probative value. Thus, we find that the court erred in admitting the letters in their entirety.

¶ 27    Finally, defendant argues that the error was not harmless, because the case was close concerning intent and whether a "true threat" was made, such that the prejudicial effect of the evidence could have tipped the balance on the jury's determination of those matters.

¶ 28    "The improper admission of other-offenses evidence is harmless error when a defendant is neither prejudiced nor denied a fair trial because of its admission." *People v. Quintero*, 394 Ill. App. 3d 716, 728 (2009). "The State bears the burden of persuasion to prove beyond a reasonable doubt that the result would have been the same without the error." *Id.* In deciding whether the admission of other-crimes evidence was harmless beyond a reasonable doubt, we consider whether the other-crimes evidence was a material factor in the conviction such that without the evidence the verdict likely would have been different. *People v. Clark*, 2015 IL App (1st) 131678, ¶ 65. If the error is unlikely to have influenced the jury, its admission will not warrant reversal. *Id.*

¶ 29    First, we observe that the State makes no harmless-error argument in its brief. Given that the State bears the burden of showing harmless error and has failed to make any such argument in its brief, it has forfeited any harmless-error analysis. See *People v. Ceja*, 381 Ill. App. 3d 178, 183 (2008).

¶ 30    In any event, the error was not harmless.  There was no limiting instruction provided to the jury, which thus was free to consider the letters in any manner that it saw fit, including as evidence of propensity.  "The erroneous admission of other offense evidence 'carries a high risk of prejudice and ordinarily calls for reversal.' "  *People v. Bedoya*, 325 Ill. App. 3d 926, 937-38 (2001) (quoting *People v. Lindgren*, 79 Ill. 2d 129, 140 (1980)).  Given the nature of the improper material, we cannot say beyond a reasonable doubt that the result would have been the same without the error.

¶ 31                                    III. CONCLUSION

¶ 32    The trial court erred when it admitted the letters in their entirety, and the error was not harmless.  Accordingly, the judgment of the circuit court of Kendall County is reversed and the cause is remanded for a new trial.

¶ 33    Reversed and remanded.