2022 IL App (2d) 210296
No. 2-21-0296
Opinion filed November 29, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) ) ) | Appeal from the Circuit Court of Stephenson County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-120 |
| ROBERT M. STOWE, | ) ) | Honorable Michael P. Bald, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BRENNAN delivered the judgment of the court, with opinion.
Justices McLaren and Jorgensen concurred in the judgment and opinion.

**OPINION**

¶ 1    On May 17, 2018, defendant, Robert M. Stowe, was working a shift at Willow Glen Academy (Willow Glen). Willow Glen provides for the basic daily needs of mentally and physically disabled individuals, including daily hygiene, feeding, and bathing. Defendant was working as a direct service provider, caring for J.B., a 14-year-old autistic boy, at one of Willow Glen's residential facilities known as Kunkle House in Freeport. After J.B. soiled himself, defendant took J.B. to a bathroom to clean him up. Minutes later, a supervisor walked in on defendant while he was with J.B. in the bathroom. Based upon what the supervisor believed she witnessed when she opened the door, the police were called and defendant was ultimately charged with criminal sexual abuse and aggravated criminal sexual abuse.

¶ 2    The case was tried before a jury, which convicted defendant on both counts. Defendant appealed. He contends the trial court erroneously allowed the State to introduce into evidence two photos recovered from his cell phone depicting nude adult men. For the reasons that follow, we conclude that the trial court's admission of the photos was error and that defendant suffered prejudice. Accordingly, we reverse and remand.

¶ 3                              I. BACKGROUND

¶ 4    The State charged defendant on May 24, 2018, with criminal sexual abuse and aggravated criminal sexual abuse. 720 ILCS 5/11-1.50(a)(2) (West 2018) (criminal sexual abuse); *id.* § 11-1.60(d) (West 2018) (aggravated criminal sexual abuse). The charges centered around the observations of defendant's supervisor, Marvetta Phillis, who informed police that she walked in on defendant masturbating J.B. in the Kunkle House bathroom.

¶ 5                        A. The State's Motion *In Limine*

¶ 6    Before trial, the State filed, *inter alia*, a motion *in limine* seeking to introduce two images recovered from defendant's cell phone pursuant to a search warrant. The images each depicted an adult nude man with an erection. The State argued that the images were relevant (1) to establish defendant's intent to commit the conduct alleged for sexual gratification or arousal and (2) to disprove any claim that defendant's conduct was accidental or inadvertent. To support the latter claim, the State cited *People v. Illgen*, 145 Ill. 2d 353, 367 (1991) ("evidence of defendant's prior offenses against the victim or persons in the same class with the victim is admissible to negate a claim that the victim's injury was accidental or inadvertent."). In arguing specifically that the photographs were relevant to show "defendant's interest in a particular class of individual, specifically males," which in turn showed that he was touching defendant for the purposes of sexual arousal or gratification, the State cited *People v. Ressa*, 2019 IL App (2d) 170439, *People*

*v. Fretch*, 2017 IL App (2d) 151107, ¶ 76 ("[T]he law does not shield a defendant from proof of his particular tendencies or patterns of conduct, as they might bear logically on whether he acted in conformity with them in committing the charged offense."),and *People v. Gumila*, 2012 IL App (2d) 110761.

¶ 7    In his written response, defendant argued that (1) the State failed to establish that the presence of the photos on defendant's phone indicated any sexual proclivity, (2) the State offered no evidence that sexual interest in adult males is associated with sexual interest in male children, (3) none of the cases cited by the State "allow a child-sex case to be prosecuted using sexual attraction to males generally as evidence of a defendant's intent or motive of the child-sex allegation," and (4) the minimal probative value was substantially outweighed by the danger of unfair prejudice or confusion of the issues in that, "[t]o present these photos to a jury would probably evoke unfavorable sentiment toward the Defendant from a juror who regards pornography and/or homosexuality as immoral, abnormal, or distasteful."

¶ 8    At the hearing on the motion, the State argued that the photos were evidence of defendant's sexual proclivities and relevant to prove intent or motive. It claimed the photos would rebut any defense argument that defendant had no tendency to commit the charged offense, because he was married to a woman. The State argued that the photos go

> "directly to an element of the offense, and then I guess you look at it specific ways. So let's
> say this were the inverse here, the victim was a female and the photo on the phone was of
> a nude female. I believe the evidence in that situation would be less probative because it's
> kind of—I'm trying to be delicate here because I'm not saying one is right or wrong, but I
> think the traditional expectations of society is that men are attracted to women. So if you

were to say—if this was a photo of a female on the phone and it was a female victim this would be less probative.

But if the situation is the inverse here where the victim is a male, kind of which is against the traditional expectations of society, that a male wouldn't be attracted to another male, how do we prove that in fact this was done for sexual purposes? Well, the photos show that this is his—a class of individuals that he may or may not be sexually attracted to.

Whether that class is with the defense, I think they kind of hash out in their motion is the class is a disabled child who is a male, where that is a class, but I don't think that a class needs to be limited to that limited of a purpose. A class could just be males. And that what is [*sic*] we would offer this for."

The State reiterated that the photos were also intended to prove absence of mistake. Further, the State argued that one of the photos was "accessed at a time while [defendant] was at work" and thus went to defendant's "state of mind while he was at work."

¶ 9    Defense counsel responded primarily by attacking the premise of the State's proclivity argument, asserting there was no support in Illinois law "[t]hat a sexual attraction to adult males equates to a sexual proclivity toward male children":

"That is just not supported. It's not logically true, it's not supported in common law that you shouldn't be allowed to, in a child sex case, prove that the defendant had a motive or intent to do the crime because that defendant might be sexually attracted to adults of the same gender.

When the cases talk about a particular class, they say things like female children. Female minors. There's no case that says males or females. That would not be a particular class. That would be a more general class."

Defense counsel also attacked the foundation for the photos, arguing that the report from the forensic software program "Cellebrite" "doesn't show the source of these photographs, that doesn't show if my client got these on the internet, or if they were sent to him by somebody or whatever." Further, "they would evoke unfavorable sentiment because a juror might well, probably would, view pornography and maybe homosexuality as immoral, abnormal or distasteful and as such, they might hold it against the Defendant and the negative consequences of that are untold." In sum, counsel argued that the probative value was extremely minimal and outweighed by the danger of unfair prejudice or confusion of the issues.

¶ 10    The trial court granted the State's motion to allow the evidence. First, the court stated, "It is evidence that the Court feels does fit under the cases that were cited by the State. It's in regard to a proclivity, essentially is what it amounts to." Second, "although there is some prejudice involved, it's not any that would overcome the relevance of the matters in question here."

¶ 11    The case proceeded to a jury trial in January 2020.

¶ 12                                B. The State's Case

¶ 13    The State's first witness was Daniel Moore, a Freeport police officer. Moore testified that he was called to Kunkle House on May 17, 2018. Moore interviewed Mishea Boggess, Phillis (twice), defendant (three times), and David Heller, a Willow Glen nurse. With the agreement of defense counsel, the State played a video of Moore's conversation with Heller. Heller told Moore that, contrary to defendant's claim, there was no sore on J.B.'s penis but described "it" as a "[s]light

redness." On the video, Heller says there was no open wound but there was a "very slight reddened area" or "very slight erythema," about a half centimeter in size on J.B.'s penis.

¶ 14    The State also played a recorded interview between Moore and defendant. Moore agreed that defendant told him that both of his hands were on his cell phone when Phillis walked in the bathroom. In the interview, defendant claimed that, at the moment Phillis walked in the room, defendant held his phone in both hands and he had "just sat down." Defendant also speculated that Phillis had seen his hand on J.B.'s arm prior to entering the bathroom, because the door was slightly open. Moore did not know whether defendant knew what Phillis had accused him of doing. Defendant consented to Moore looking through his phone

¶ 15    Nate Macklin, a sergeant with the Illinois State Police, testified next. He used Cellebrite to examine defendant's phone. Cellebrite extracts and converts data from mobile devices for forensic reports. Sometimes the reports include erased information. Macklin generated a report for defendant's cell phone, which contained 834 photos and 65 videos, and gave the report to Freeport police detective Tony Bradbury. Macklin does not review the content of the reports he creates.

¶ 16    Bradbury testified next. He acquired defendant's cell phone from defendant's wife and sent it to Macklin. He testified to his review of Macklin's Cellebrite report:

> "Q. Did you notice anything that you thought might be relevant in a case involving sexual assault of one male with another male?
>
> A. Yes.
>
> Q. What were those?
>
> A. Images of nude males on Robert's phone history."

The report consisted of 543 pages, which included two images of nude adult men with erections. Each of those images was published to the jury. Bradbury said he also found "erotic literature."

On cross-examination, Bradbury acknowledged he did not find any photos of nude children in the report. He said he could not answer whether the images of nude adult men had been deleted from defendant's phone. Bradbury also agreed that he authored the search warrant complaint for defendant's phone, in which he stated that it was highly probable that defendant's cell phone could contain photographs or video of J.B. No photos of J.B. were recovered.

¶ 17    Erik Walton testified next. He was a "Clinician/case manager" at Willow Glen, which he described as a residential facility that cares for kids and adults with mental disabilities. J.B. has autism and traumatic brain injury and exhibits self-injurious behaviors. J.B. required a direct service provider to be "one-on-one" and within "arm's reach" as part of his care plan. J.B. "could actually climb out of his wheelchair and will start to bang his head for attention seeking, things like that." J.B. also masturbates, according to his care plan.

¶ 18    Walton received a call from Phillis on May 17, 2018. She sounded "scared" and "shook." He drove to Kunkle House and called a former supervisor to assist Heller had also been called to Kunkle House. Walton took J.B. to the hospital after the incident. He was not aware of any animosity between Phillis and defendant.

¶ 19    Victoria Kelly testified next. She was a nurse practitioner at Freeport Hospital, in the emergency room. She examined J.B. on May 17, 2018. She noticed a spot on J.B.'s penis, stating, "I remember that it was very faint and somebody had to point it out." She did not prescribe anything and was not concerned. She reviewed a handwritten statement prepared by Heller and said she did not disagree with anything in it. Heller's statement was entered into evidence by joint stipulation. Notably, Heller wrote, "Client without guarding behavior. Client cooperative with examination. Without signs or symptoms of mental or physical distress."

¶ 20    Kelly explained that "erythema" means redness. On cross-examination, Kelly stated that "sore" is not a medical term. She also opined that J.B. was not in physical distress, although she was not familiar with his baseline mental status.

¶ 21    Andrew Miller testified next. In May 2018, he was assigned to Kunkle House as a direct service provider. Miller explained that J.B. was considered an arm's reach one-on-one client, meaning that a provider must be within arm's reach of the client at all times. J.B. wears a diaper and frequently masturbates. As a one-on-one for J.B., a provider would change his diapers and assist him to the bathroom whenever he felt the need to masturbate. Miller would sometimes sit on the tub while supervising J.B. during his masturbation, although other staff members preferred not to:

> "Q. Was it acceptable to—for other staff—did other staff always sit on the tub, or was it—other options?
>
> A. There were—a majority of the staff were females and they've stood in a doorway most of the time because they didn't even want to—understandably didn't want to be in the room, but they had to watch him."

Miller indicated he would sit on the end of the tub as far away as possible from J.B. and not directly beside J.B. because, "You don't want to be sitting too close to him when he's masturbating."

¶ 22    Miller explained that J.B. masturbates in a unique manner: "He didn't use his hands. He would put his penis between his thighs and move his thighs back and forth. The only time he touched his penis with his hands was to place it between his thighs."

¶ 23    Willow Glen's policy when an employee suspects a nonemergency injury to a child was for the employee to put on gloves, call in another employee to witness, and call in a nurse. If the employee was in a bathroom with a client, he or she would yell out for assistance. Miller knew

this from working at Willow Glen for years. Finally, Miller was not aware of any conflicts between Phillis and defendant.

¶ 24    On cross-examination, Miller said there was no written policy or formal instruction as to where an employee should sit while supervising J.B. while he masturbates. Miller also acknowledged that it would be quicker to reach J.B. in an emergency while seated at the tub than while standing in the doorway.

¶ 25    Phillis testified that she was a direct service provider at Willow Glen. In May 2018, she was a supervisor at Kunkle House. Defendant was a staff member at that time, having started in September 2017. He was a hard worker and a dependable employee.

¶ 26    Phillis recounted that, on May 17, 2018, defendant was a one-on-one for J.B. At around 7 p.m., staff and residents at Kunkle House were outside. She noticed J.B. had a wet spot and directed defendant to change J.B.'s diaper. Defendant and J.B. went inside and the rest of the staff and residents followed 5 to 10 minutes later.

¶ 27    Phillis needed a key in defendant's possession, so she went to the bathroom he and J.B. occupied. The door was cracked open about an inch or two. Phillis knocked while opening the door, without waiting for a response: "Once I stepped inside, I noticed that [defendant] had his [right] hand on J.B.'s penis and was doing a stroking motion." Defendant had his cell phone in his left hand. "It was probably a few seconds when he noticed that I was in the bathroom, [defendant] jumped up and was, like, I can't sit here while he's doing this."

¶ 28    Phillis was "shocked, stunned," and she "kind of gasped." She told defendant, "I need the key and I'll be right back," and "ran down to the other bathroom where the other staff was." She hurried back to relieve defendant:

"So when I went back down, I was, like, I'm taking over. I'll be [J.B.'s] one-on-one. He was, like, No, I'm fine. I just can't sit here while he's doing this. I was, like, No, I'm fine. I'll take over as [J.B.'s] one-on-one. I was, like, I just need you to stay out here."

Phillis had another employee take over with J.B. and called defendant into the office, where he began to question her:

"Q. So let me stop you there. So you tell him he needs to go into the office and his response is—he questioned—

A. He's, like—Yeah. What's going on? Are you mad at me? Tell me what's happening. I know you're going to call me in. If you're going to call me in, do me a solid and tell me what you're calling me in for. And I was, like, Robert, I just need you to stay here, and I was not willing to talk at this time.

Q. Okay. Did you feel like you weren't able to talk, too, based on what you just witnessed?

A. I wasn't able to talk and I didn't want to talk."

Phillis said there was no formal training on how to respond in this situation and agreed that her emotions were getting the best of her. She said defendant continued to try to talk to her but she refused; defendant did not tell her about the sore on J.B.'s penis.

¶ 29 Phillis explained that other staff observe J.B. from the doorway:

"[J.B.] is what we call assigned one-to-one. Our one-to-one's has different levels where you have to be within arm's reach, where you have to have a line of sight. [J.B.] is an arm's reach one-to-one because he is self-injurious and he bangs his head. But [J.B.]also is a frequent masturbator, so we all, as the staff, have always—whenever [J.B.] is in the bathroom and he's masturbating, no one stands right over him while he's doing it. We

generally stand at the doorway to kind of give him a little bit of privacy and record decorum so that way—you know, he's a young man. One, it's uncomfortable for us, but I'm pretty sure it's uncomfortable for him as well."

Additionally, defendant was not wearing gloves, even though he was supposed to change J.B.'s diaper and the first step is to put on gloves. He did not yell out for assistance either.

¶ 30 Phillis had never walked in on J.B. masturbating in a bathroom in the presence of another employee before, but she said seeing this would not shock her. Finally, when asked if there was any doubt about what she saw, Phillis answered, "There's no doubt."

¶ 31 On cross-examination, Phillis stated that she assigned defendant to supervise J.B. at the start of his shift. J.B. wore a padded helmet to prevent him from banging his head, though he sometimes removed the helmet himself. Phillis also acknowledged that she was required to prepare a written statement on the day of the incident. In the statement, Phillis noted that defendant asked if he was being reprimanded because of his cell phone use.

¶ 32 After Phillis testified, the State sought to enter several exhibits into evidence, including the two photos that were the subject of the State's second motion *in limine*. Defense counsel renewed the defense objection to those photos, which the court denied. The photos were entered into evidence. The parties also stipulated to the dates of birth of J.B. (January 10, 2004) and of defendant (January 9, 1977). The State rested and the defense moved for a directed verdict, which the trial court denied.

¶ 33 C. The Defense Case

¶ 34 In its case-in-chief, defendant briefly recalled Bradbury, who recounted collecting a DNA sample from defendant, and Moore, who recounted collecting a sexual assault kit performed on J.B. Defendant then testified in his own defense.

¶ 35 Defendant worked at Willow Glen in a teaching capacity while pursuing a doctorate degree in higher education. It was the only job he could get in an educational facility, a prerequisite to applying for certain scholarships and grants. He also volunteered as a direct service provider: "I took a lot of overtime shifts to help out because they couldn't seem to keep anybody in Kunkle House to work, and I decided that I would go ahead and work because I needed the extra money because I wanted to move and begin my career."

¶ 36 Defendant denied touching J.B.'s penis. He explained that J.B. had soiled himself and he was told to prepare J.B. for a shower:

> "I put his clothes and towel—or his clothes to the right, his soap and everything. I put my gloves on, he sat himself on the toilet. I had to help him take his shorts off. I had to help take his diaper off. First, I had to get his shoes, his leg brace. I threw his diaper in the trash behind me. I put his soiled pants behind me. I took off his socks and put them behind me, and then I sat on the side of the tub."

Defendant was using his phone even though he knew he was prohibited from doing so.

¶ 37 After defendant disrobed J.B., J.B. started to masturbate, so defendant started playing Junkyard Tycoon on his phone. He had thrown his gloves away because they were soiled. At one point, J.B.'s erect penis came up from between his legs and defendant saw a spot. He grabbed J.B.'s arm so he could observe closer, but J.B. fought him for a few seconds, so defendant let go. His phone was still in his other hand. Defendant "just gave up because it's not worth it."

¶ 38 Just then, as defendant was sitting down, Phillis entered the bathroom and asked for a key, startling defendant. He denied knowing that Phillis suspected he molested J.B.; rather, he thought he might be in trouble for using his cell phone. Upon learning from Moore why Phillis reacted the

way she did, defendant was in "[u]tter shock." He was not able to get a good look at the mark on J.B.

¶ 39   Defendant stated, over the State's objection, that he was married and had been for six years. He also stated that he was not gay or attracted to nude males. The supposed still photos on his phone were actually GIFs:

> "Q. Can you spell and describe what a GIF is?
>
> A. From my understanding, because I'm not in the technology world, GIF is G-I-F and it's, like, a short video that is, like, a joke.
>
> Q. Does the video loop itself?
>
> A. It does.
>
> Q. What do you mean by that?
>
> A. It starts and then it goes and then—it's just a continuous pattern. It just continues to go.
>
> Q. Okay. So your indication is that this one GIF contained both of those photos?
>
> A. Yes.
>
> Q. Are there actually any still photos on your phone?
>
> A. Any still photos?
>
> Q. Of these adult males?
>
> A. No, there are not.
>
> Q. They're only contained on the GIF, correct?
>
> A. Only contained on the GIF, correct. Yes, that is correct."

¶ 40   On cross-examination, defendant explained that he first saw the sore while disrobing J.B. and again while J.B. was masturbating. The state's attorney followed up:

"Q. Okay. So when you testified—when your attorney was asking you questions and you said you noticed it when his penis popped up, that wasn't true; you noticed it prior to that?

A. Oh, I noticed it more[ ]so then, yes."

When defendant grabbed J.B.'s arm, he said J.B. was trying to push his penis down with his own hand. He gave up, explaining that J.B. was "resistant and strong." When asked why he didn't immediately report the sore to Phillis, defendant said, " I didn't really think about it at the time."

¶ 41 The state's attorney continued:

"Q. Okay. In your interview with Officer Moore you said, If she would have asked me, I would have showed her the sore. Do you recall saying that?

A. Yes, I do.

* * *

Q. I guess I'm confused about the statement, If she would have asked me, I would have showed her the sore?

A. If she would have asked what was going on, I would have stated, Hey, I'm trying to look at this sore. She just, Do you have to [*sic*] blue keys? No, and left. I had no clue why I was—what—that there was anything wrong."

¶ 42 On redirect, defendant explained that Glen Willow keeps books for each client: "There's a book that [*sic*] every activity, food they eat, bowel movement." From his understanding, J.B.'s masturbation practices would have been recorded in the book and, if they were, he would have read it. On recross, defendant acknowledged that he was not aware of any red sores reported in J.B.'s book.

¶ 43 D. Closing Arguments and Verdict

¶ 44    The State did not refer to the photos during its opening close. During closing argument, defense counsel referred to the two photos. Counsel argued that police had discovered no incriminating images on defendant's phone; instead, they found two "distasteful photographs" introduced solely to make defendant look bad:

> "There was nothing on the phone from the incident with [defendant] and J.B. in the bathroom, but several adult nude males with erections were found amongst the 834 photographs on the phone. So I guess since they didn't find what they were looking for, they're going to show you a couple of distasteful photographs to make him look bad. There's no good reason to show those photographs to you at this trial."

In rebuttal, the State argued that the photos were relevant in that they "make it more or less likely that he was masturbating a child":

> "And in the opening statements—with regards to the photographs on the phone. Listen, it's the defendant's phone, these photographs were on there. All right? What is he accused of doing? Sexually abusing another male. What is on his phone? Nude photos of a man with an erection. He had an excuse for them, like he has an excuse for everything.
>
> Why is that relevant? It's relevant because relevance is something that makes a fact of consequence more or less likely. So would—does this make it more or less likely that he was masturbating a child? It doesn't hurt. Right? That's not why we charged him. It's just a piece of evidence. We presented you evidence. I hardly touched on it and I don't think it's that big of a deal, but I do think it's relevant, and it's relevant just for what I said. That's not why he was charged."

¶ 45    Following closing arguments, the trial court admonished the jury, in part:

> "From time to time it's been the duty of the Court to rule on the admissibility of

evidence. You should not concern yourselves with the reasons for these rules. You should disregard questions which were withdrawn or to which objections were sustained.

Any evidence that was limited for a—or excuse me—that was received for a limited purpose should not be considered by you for any other purpose. You should disregard testimony which the Court has refused or stricken. The evidence which you consider consists only of the testimony of the witnesses and the exhibits which the Court has received. You should consider all the evidence in the light of your own observations and experience in life."

¶ 46    The jury found defendant guilty of both counts. Defendant filed a motion for a new trial, arguing, *inter alia*, that the trial court admitted the photos of the nude adult men in error. The court denied the motion, merged the two counts, and sentenced defendant to 3½ years' imprisonment. Defendant timely appealed.

¶ 47                                    II. ANALYSIS

¶ 48    Defendant argues that the trial court violated his right to a fair trial when it allowed the State to introduce two photos of nude adult men recovered from his cell phone. He contends that the photos were irrelevant and, alternatively, the probative value of the photos was substantially outweighed by the dangers of unfair prejudice and jury confusion. In turn, defendant argues that the evidence was not overwhelming and thus the court's error was not harmless. We agree that the photos should have been excluded and the trial court's failure to exclude them was not harmless.

¶ 49                                    A. Relevance

¶ 50    All relevant evidence is generally admissible (Ill. R. Evid. 402 (eff. Jan. 1, 2011)), but the State bears the burden of demonstrating the admissibility of evidence it offers. See *People v. Torres*, 2012 IL 111302, ¶ 53 ("As in any other instance, the proponent of evidence bears the

burden of proving the necessary elements for admissibility."). The State argues that the photos were admissible under Rule 404(b) of the Illinois Rules of Evidence (Ill. R. Evid. 404(b) (eff. Jan. 1, 2011)) to prove defendant's intent to commit the charged offenses. More specifically, the State cites several cases for the proposition that evidence of a defendant's sexual interests or tendencies is highly relevant to prove intent or knowledge. See *Ressa*, 2019 IL App (2d) 170439, ¶¶ 29, 35 (holding that the defendant's possession of materials referencing fantasies involving children was relevant to show he touched the minor victim for the purpose of sexual gratification); *Fretch*, 2017 IL App (2d) 151107, ¶¶ 74-80 (holding that the defendant's prior sexual overtures to minor girls, including the victim, were relevant evidence of his intent to expose his penis to a young girl); *Gumila*, 2012 IL App (2d) 110761, ¶¶ 42, 55 (holding that introduction of Internet browsing history evidence associated with child pornography was relevant to show the defendant's intent to possess child pornography). Indeed, evidence is relevant if it has "*any tendency* to make the existence of *any fact* that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (Emphases added.) Ill. R. Evid. 401 (eff. Jan. 1, 2011).

¶ 51 Relevant evidence may be excluded, however, if its probative value is substantially outweighed by the danger of unfair prejudice or confusion of the issues. Ill. R. Evid. 403 (eff. Jan. 1, 2011).

> "Evidence is *unduly* prejudicial only if it 'cast[s] a negative light upon the defendant *for reasons that have nothing to do with the case on trial*' [citation], or invites the jury to decide the case 'on an improper basis, commonly an emotional one, such as sympathy, hatred, contempt, or horror' [citation]." (Emphases in original.) *People v. Romanowski*, 2016 IL App (1st) 142360, ¶ 30.

The trial court's admission of evidence is reviewed for an abuse of discretion. *People v. Gregory*, 2016 IL App (2d) 140294, ¶ 24. A trial court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable. *Id.*

¶ 52    The threshold question here is whether the existence of two photos of nude adult men on defendant's phone is relevant to the charge that he sexually abused a young boy. If so, the next question is whether the relevance of such evidence is substantially outweighed by the danger of unfair prejudice or confusion of the issues.

¶ 53    The State asserts that the photos were admissible because evidence of defendant's sexual interest in other men makes it more likely that he sexually abused the 14-year-old autistic boy in his care. The State characterizes J.B., the 14-year-old autistic boy, as sexually mature. The State charged defendant with criminal sexual abuse and aggravated criminal sexual abuse. 720 ILCS 5/11-1.50(a)(2) (West 2018) (criminal sexual abuse); *id.* § 11-1.60(d) (West 2018) (aggravated criminal sexual abuse). Both charges require that the State prove defendant committed an act of sexual conduct. " 'Sexual conduct' means any knowing touching or fondling by the victim or the accused *** for the purpose of sexual gratification or arousal of the victim or the accused." *Id.* § 11-0.1. Indeed, as defendant disputes that he touched J.B.'s penis as alleged, evidence of his intent is probative both as to the *actus reus* and as to whether he acted for the purpose of sexual gratification.

¶ 54    The State's argument requires three interrelated inferences: (1) possession of two photos of nude adult men is probative of sexual attraction to men, (2) sexual attraction to men is probative of sexual attraction to boys, and (3) sexual attraction to boys is probative of intent to sexually abuse a boy. On appeal, the State primarily relies on *People v. Davis*, 260 Ill. App. 3d 176 (1994), for the proposition that "evidence of a defendant's interest in other adult males is relevant to charges

that the defendant sexually assaulted younger males." The State maintains that evidence of sexual attraction to adult males is admissible as evidence of intent to molest a minor male.

¶ 55 In *Davis*, the defendant pastor was convicted of sexually abusing two minor church members. The State introduced evidence of the defendant's sexual relations with other men to show a common plan, scheme, or design; to confirm defendant's identification; and to show lack of conspiracy by the victims. See Ill. R. Evid. 404(b) (eff. Jan. 1, 2011) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith ***. Such evidence may also be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."). The court held that the evidence was admissible to show a common plan, scheme, or design. *Davis*, 260 Ill. App. 3d at 190-91. The witnesses described questions the defendant would ask, the type of lubricant he used, the manner in which he performed sexual acts, and intimate details of his body. *Id.* at 190-92. Importantly, "[t]hese accounts were similar enough to inform the court of [the] defendant's common plan, scheme, or design, but were varied enough to be credible and to confirm that the testimonies were not part of a rehearsed conspiracy against [the] defendant." *Id.* at 191.

¶ 56 *Davis* is inapposite. There, the State offered testimony to confirm identity, to show lack of conspiracy on the part of the accusers, and to establish the defendant's common plan to sexually solicit members of his church. Here, the State offered two photos to establish defendant's attraction to adult men. The State makes no argument that the photos were relevant to establish identity or to show a common plan or a lack of conspiracy. *Davis* does not support the argument that sexual interest in adult males, without more, makes it more likely that a defendant molested a minor male.

¶ 57    Moreover, we note that the State urged a different line of cases (*Ressa*, *Fretch*, and *Gumila*), which the court relied upon when it granted the State's motion *in limine* to admit the photos. Pursuant to that motion, the State argued that the photos were relevant to establish defendant's sexual interest in males generally and, resultingly, defendant's intent. At the hearing on the motion, the State contended that defendant's interest in male sexual images went against the "traditional expectations of society" and argued that the photos showed "a class of individuals that [defendant] may or may not be sexually attracted to," namely, other males. The State also argued,

> "[T]hese photos themselves are more probative than it would be the inverse where it was a female and a female victim and female pornography on the phone but at the same time even then, we're at a low degree of probability. The circumstances here I think increase the probative value of this evidence[.]"

The trial court agreed with the State, granting the motion *in limine* because it viewed the photos as evidence of defendant's sexual proclivities and thus probative of intent to commit the charged acts for sexual gratification, which "fit under the cases that were cited by the State."

¶ 58    To the extent the trial court relied on *Ressa*, *Fretch*, or *Gumila* to reach its decision, the court misread the import of those decisions.

¶ 59    Each of these cases is distinguishable in that the challenged evidence involved sexual misconduct toward children. In *Ressa*, the defendant challenged the introduction of, *inter alia*, his own writings and his online searches pertaining to children who had been murdered and sexually molested. *Ressa*, 2019 IL App (2d) 170439, ¶¶ 29, 35. The trial court explained that the contested evidence put the "defendant's otherwise 'innocent' touching in context, as the vast majority of it revolved around [the] defendant's obsession with sexual activity with or related to children." *Id.*

¶ 35. In *Fretch*, the defendant challenged evidence that he had previously made sexual overtures to minor girls. *Fretch*, 2017 IL App (2d) 151107, ¶ 46. These interactions were relevant to show the defendant's general interest in minor girls such as the alleged victim. *Id.* ¶¶ 74-80. In *Gumila*, the defendant challenged evidence of his Internet browsing history associated with child pornography. *Gumila*, 2012 IL App (2d) 110761, ¶ 42. This history, however, "suggest[ed] that [the] defendant sought out, intended to revisit, and indeed did revisit sites with names and descriptions suggestive of child pornography," supporting the inference that the defendant's accessing of illicit images was not inadvertent. *Id.*

¶ 60    In each of those cases, the contested evidence was, on its face, probative of sexual attraction to children. Here, the contested photos did not involve children (*contra Ressa*, 2019 IL App (2d) 170439, ¶ 29), show defendant's conduct toward children (*contra Fretch*, 2017 IL App (2d) 151107, ¶ 46), or establish that defendant sought out child pornography (*contra Gumila*, 2012 IL App (2d) 110761, ¶ 42). The instant photos were, at best, probative of sexual attraction to a class of adults, and the State offered no evidence to support the further inference that sexual attraction to that class of adults is probative of sexual attraction to children of any kind.

¶ 61    The State argued that evidence of defendant's possession of the photos of nude adult men in a state of arousal made it more likely that he touched J.B. *for the purpose of sexual gratification*. Even accepting the State's premise that possession of the photos was probative of defendant's attraction to men, the State went further. Regarding the relevance of the photos, the state's attorney rhetorically asked during his rebuttal argument: "[D]oes this make it more or less likely that he was masturbating a child? It doesn't hurt. Right?" This could be read as directly equating same-sex attraction to men with a propensity to sexually abuse male children, an assertion otherwise unsupported by any evidence in the record. Given the state of the evidence in this case, the

photographs bore no relevance to the charged offenses.

¶ 62    We also reject the State's reliance on cases that admitted, in rebuttal, prior bad acts evidence to explain why the accused was with the victim or to show absence of mistake. In support of its position, the State cites *dicta* from *Fretch*. To determine whether the defendant in *Fretch* had placed his intent at issue, the court reviewed "cases in which the defendant did not admit to the acts underlying the offense but did admit at least that he was with the victim at the time in question, and the evidence raised questions about the defendant's conduct and intent toward the victim during that time." *Fretch*, 2017 IL App (2d) 151107, ¶ 66. Each of the cases relied on in *Fretch* is readily distinguishable from the facts here.

¶ 63    For instance, in *People v. Luczak*, 306 Ill. App. 3d 319, 326 (1999), the defendant argued that other-crimes evidence was irrelevant to establish intent because he had acknowledged being with the victim but denied sexual conduct. But the defendant had given an explanation for his being with the victim that differed from the reason given by his accuser, and the defendant's intent for being with the victim was a contested issue at trial. *Id.* Here, in contrast, defendant's reason for being with J.B. was not contested. Both Phillis and defendant testified that Phillis instructed defendant to take J.B. into the bathroom to clean him up.

¶ 64    Similarly, in *People v. Wilson*, 214 Ill. 2d 127, 138 (2005), our supreme court explained that other-acts evidence was permissible to rebut the defense theory that the defendant was "the kind of person that touches people" and that, "even if there was contact with the victims, it was merely incidental contact and not for sexual arousal." The court explained that "defense counsel raised motive, intent and *the possibility that any of the complained-of touching was inadvertent* in such a way that the jury could acquit defendant even if it believed that he actually touched the victims' breasts." (Emphasis added.) *Id.* Here, defendant does not claim he touched J.B.

inadvertently—he denies touching J.B.'s penis altogether. While the State was obligated to prove that defendant's touching was for sexual arousal or gratification, evidence that defendant had photos of two adult males was not relevant under the facts of the case to prove this proposition.

¶ 65    Our review of cases from other jurisdictions supports our conclusion that the admission of the photos was an abuse of discretion under the facts of this case. See *People v. Garcia*, 177 Cal. Rptr. 3d 231, 240-41 (Ct. App. 2014) (holding evidence of female defendant's sexual orientation was not relevant to charge she sexually abused a young girl); *State v. Crotts*, 104 Ohio St. 3d 432, 2004-Ohio-6550, 820 N.E.2d 302, ¶ 12 ("We must note that the modern understanding of pedophilia is that it exists wholly independently from homosexuality. The existence or absence of one neither establishes nor disproves the other. 'The belief that homosexuals are attracted to prepubescent children is a baseless stereotype.' [Citation.] Thus, evidence of homosexuality is not relevant to establish pedophilia. [Citation.] We are forced to state the obvious because of the reckless and bald assertion by the appellate court that the prosecutor argued, and the jury believed, that because [the defendant] is homosexual, he therefore is also a pedophile."); see also *State v. McGrath*, 501 P.3d 346, 356 (Idaho 2021) (in prosecution for lewd conduct with a minor, holding probative value of still images from pornographic videos was substantially outweighed by risk of unfair prejudice where no evidence in record showed videos depicted *child* pornography); *Cutshall v. State*, 166 N.E.3d 373, 379 (Ind. Ct. App. 2021) (holding evidence that defendant accessed adult pornography on the night of alleged incident was not relevant to charge that he molested a child). The admission of the photos into evidence had the primary effect of casting a negative light on defendant for reasons unrelated to the trial and invited the jury to decide the case based on an improper propensity inference. See *Romanowski*, 2016 IL App (1st) 142360, ¶ 30.

¶ 66    Simply put, under the facts of this case, the trial court's admission of the photos was an

abuse of discretion.

¶ 67                                    B. Harmless Error

¶ 68     If admission of the photos was error, the State argues that the error was harmless. An evidentiary error is harmless if there is no reasonable probability the jury would have acquitted the defendant without the error. *People v. Shaw*, 2016 IL App (4th) 150444, ¶ 66 (citing *In re E.H.*, 224 Ill. 2d 172, 180 (2006)); see also *People v. Cortes*, 181 Ill. 2d 249, 285 (1998) ("While the erroneous admission of other-crimes evidence carries a high risk of prejudice and ordinarily calls for reversal [citation], the evidence must be so prejudicial as to deny the defendant a fair trial ***."). In the State's view, the jury would have found defendant guilty even without viewing the photos, because the State presented substantial evidence of defendant's guilt. See *People v. Bochenek*, 2020 IL App (2d) 170545, ¶ 67 ("Generally, even if the other-crimes evidence is erroneously admitted, it is harmless if there is substantial evidence of the defendant's guilt."), *aff'd*, 2021 IL 125889, ¶ 24; see also *People v. Nieves*, 193 Ill. 2d 513, 530 (2000) (explaining that the improper introduction of other-crimes evidence was harmless because any prejudicial effect "was *overshadowed by the substantial evidence* of defendant's guilt—most notably, his own uncontested statement" (emphasis added)).

¶ 69     Here, the State contends the error was harmless because Phillis, the sole eyewitness to the alleged offenses, testified credibly and consistently while defendant's testimony was "inconsistent and unworthy of belief."

¶ 70     Phillis testified that she observed defendant with his hand on J.B.'s penis. She observed the scene for "probably a few seconds." She was confident in what she saw. Phillis was emotional—she described herself as "stunned," while Walton described her as "scared" and "shook"—and refused to speak to defendant.

¶ 71    Defendant testified that he took J.B. to the bathroom to prepare him for a shower, and, after he disrobed J.B., J.B. began masturbating. Defendant sat on the tub beside J.B. and began playing a game on his phone. J.B.'s penis came out from between his legs, however, and defendant noticed what appeared to be a sore. He had noticed it while disrobing J.B. but "more[ ]so" at this point. He grabbed J.B.'s arm to get a closer look, but gave up when J.B. struggled. Phillis walked in just as defendant let go and sat back down. When Phillis left, defendant did not know she thought he touched J.B.'s penis.

¶ 72    The State asserts that defendant made various inculpatory statements to police and at trial; our review of the record, however, suggests otherwise.

¶ 73    First, the State argues that defendant "felt the need to preemptively explain" what he was doing with his phone and that he "displayed a defensive demeanor." Accepting the State's characterization that defendant "quickly volunteered" to police that he was playing a game on his cell phone to explain why he had been holding it while in the bathroom with J.B., it does not necessarily show consciousness of guilt of the crime charged. Defendant admitted that his cell phone use violated company policy, and he was being interrogated by police. A defensive demeanor during a police interrogation may be evidence of dishonesty, though it is susceptible of various other explanations, not the least of which is nervousness.

¶ 74    Second, the State points to inconsistent statements by defendant about when he noticed the sore on J.B.'s penis. On direct examination, defendant said he noticed it while J.B. was seated and masturbating. On cross-examination, however, defendant said he noticed it while he disrobed J.B., though he explained, "I had initially thought I saw something but I wasn't a hundred percent sure, and then when he sat down, then it did catch my attention, yes." To the extent there is any inconsistency, it is minimal. Both statements were made during defendant's testimony at trial (in

defendant's own words) and are not inherently inconsistent; rather, the second statement arguably informs the first. The State also asserts that defendant's trial testimony that he struggled to control J.B. with one hand while holding his cell phone in the other is inconsistent with Moore's testimony that defendant told police he held the phone in both hands. But defendant was describing a fluid situation in which both statements could be true at different moments.

¶ 75    Third, the State observes that while defendant claimed he had to remain "within arm's reach" of J.B., Miller testified that employees caring for J.B. when he masturbated usually stood farther away, often in the bathroom doorway. But Miller gave the reason: "You don't want to be sitting too close to him when he's masturbating." Miller did not testify that defendant broke policy by positioning himself within arm's reach of J.B.; indeed, he acknowledged sitting on the tub while supervising J.B. himself, and he explained that an employee standing in the doorway is not actually within arm's reach of J.B. while J.B. is on the toilet. Defendant's explanation of what happened is thus consistent with Miller's practices and with J.B.'s status as an "arm's reach one-on-one."

¶ 76    Fourth, the State argues that defendant's explanation that he abandoned his examination of J.B. because he decided "it's not worth it" was inconsistent with his stated concern about the purported sore and with his failure to promptly notify a superior. While the explanation is arguably inconsistent with defendant's actions, they are not contradictory. Defendant testified that he abandoned the examination because J.B. was struggling and he planned to ask another employee to take a look.

¶ 77    Finally, the State questions defendant's veracity where he claims to have touched J.B. to inspect a sore but did not immediately offer this explanation to Phillis. This suggestion, however, fails given that nothing in the record suggests that defendant was immediately aware that Phillis suspected him of touching J.B. inappropriately. Phillis testified that she was emotional and refused

to speak to defendant, which undermines the State's emphasis on defendant's failure to notify Phillis of the sore.

¶ 78    The evidence in this case is not overwhelming and boils down to a credibility contest between Phillis and defendant. Phillis was the sole eyewitness, and, according to her own testimony, she had only a few seconds to observe defendant with J.B. There was no testimony that J.B. was behaving abnormally after the incident. Indeed, Heller, the Willow Glen nurse, noted in his statement the absence of guarding behavior or signs of mental distress. And, contrary to what Moore said he suspected, there was no evidence on defendant's cell phone of photos or video of J.B.

¶ 79    The case hinges largely on Phillis's testimony that defendant's hand was on (and stroking) J.B.'s penis, rather than J.B.'s arm, as defendant claims. There was also disagreement about whether the bathroom door was open wide enough to allow Phillis to observe the scene before entering the bathroom. Defendant's version of events is otherwise compatible with Phillis's version, while the State's arguments as to defendant's narrative being "inconsistent and unworthy of belief" are not supported by the record.

¶ 80    Having determined that the evidence was not overwhelming, we cannot say that  there is no reasonable probability that the jury would have acquitted defendant without the error. *Shaw*, 2016 IL App (4th) 150444, ¶ 66. We note further that the jury was not provided any limiting instruction as to the purpose for which it could consider the photos. See Ill. R. Evid. 105 (eff. Jan. 1, 2011) ("When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, *shall* restrict the evidence to its proper purpose or scope and *instruct the jury accordingly*." (Emphases added.)). The failure to give a limiting instruction here permitted the jury to consider the evidence for any

reason, including to draw an impermissible propensity inference based on sexual orientation or lawful sexual preferences, thus enhancing the prejudice to defendant. *Gregory*, 2016 IL App (2d) 140294, ¶ 30 (failure to give a limiting instruction in conjunction with admitting propensity evidence enhances the prejudice to a defendant).

¶ 81    Accordingly, we conclude that the State has failed to show that the erroneous admission of the photos was harmless beyond a reasonable doubt, and we reverse.

¶ 82    Defendant does not argue that double jeopardy precludes retrial. See U.S. Const., amend. V; Ill. Const. 1970, art. I, § 10. Regardless, the evidence submitted is sufficient to sustain a conviction, and, thus, defendant may be retried. See *People v. Olivera*, 164 Ill. 2d 382, 393 (1995).

¶ 83                                III. CONCLUSION

¶ 84    For the reasons stated, we reverse the judgment of the circuit court of Stephenson County.

¶ 85    Reversed and remanded.

2022 IL App (2d) 210296

---

*People v. Stowe*, **2022 IL App (2d) 210296**

---

| **Decision Under Review:** | Appeal from the Circuit Court of Stephenson County, No. 18-CF-120; the Hon. Michael P. Bald, Judge, presiding. |
| --- | --- |

---

| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Vicki P. Kouros, of State Appellate Defender's Office, of Elgin, for appellant. |
| --- | --- |

---

| **Attorneys for Appellee:** | Carl H. Larson, State's Attorney, of Freeport (Patrick Delfino, Edward R. Psenicka, and Katrina M. Kuhn, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| --- | --- |