NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230280-U

NO. 4-23-0280

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 25, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| AMANDA RUTH PETERSEN, | ) | No. 21CF436 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE TURNER delivered the judgment of the court.
Justices Cavanagh and Zenoff concurred in the judgment.

**ORDER**

¶ 1     *Held*:    The appellate court reversed and remanded for a new trial, finding (1) the introduction into evidence of defendant's sexual orientation as bisexual was irrelevant to whether she sexually abused her stepdaughter and (2) based on the closeness of the case, the error was not harmless.

¶ 2     In April 2021, the State charged defendant, Amanda Ruth Petersen, with (1) two counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(b) (West 2020)), alleging defendant or one whose conduct for which she was legally responsible  committed an act of sexual conduct with a family member, her 14-year-old stepdaughter, N.N., (2) two counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(f) (West 2020)), alleging defendant or one whose conduct for which she was legally responsible, who was 17 years of age or older, committed an act of sexual conduct with N.N., who was at least 13 years of age but under 18 years of age, when defendant held a position of trust, authority, or supervision in relation to

N.N., and (3) three counts of criminal sexual assault (720 ILCS 5/11-1.20(a) (3) (West 2020)) based on alleged sexual penetration.

¶ 3 During trial, the trial court overruled defendant's objection to a portion of a video-recorded police interview in which defendant stated she was bisexual. The court found defendant's sexual orientation was relevant to whether defendant would commit the crime against a female victim. The jury found defendant guilty of the criminal sexual abuse charges and not guilty of the criminal sexual assault charges. Defendant moved for a judgment of acquittal notwithstanding the verdict or a new trial, arguing, in part, it was error under the Second District case of *People v. Stowe*, 2022 IL App (2d) 210296, to allow the jury to hear evidence she was bisexual. The court denied the motion.

¶ 4 At sentencing, the trial court stated defendant's position of trust over N.N. was a very "aggravating factor". The court sentenced defendant to the maximum extended term of 14 years in prison on the counts involving criminal sexual abuse by a person in a position of trust, authority, or supervision in relation to N.N. and merged the remaining counts. 720 ILCS 5/11-1.60(f) (West 2020); 730 ILCS 5/5-4.5-35(a) (West 2020).

¶ 5 On appeal, defendant contends the trial court erred when it (1) allowed the jury to hear evidence of her sexual orientation and (2) considered a factor inherent in the offense in aggravation at sentencing.

¶ 6 We determine (1) the introduction into evidence of defendant's sexual orientation as bisexual was irrelevant to whether she sexually abused her stepdaughter and (2) the error was not harmless. Accordingly, we reverse and remand for a new trial.

¶ 7 I. BACKGROUND

¶ 8 A. Trial

¶ 9        Defendant was arrested on April 15, 2021, in connection with allegations she and her husband, Justin N., sexually abused Justin's daughter, N.N., on December 4, 2020, at a Quality Inn in Bloomington, Illinois. In December 2022, a jury trial was held.

¶ 10       Before opening arguments, the trial court instructed the jury it must not be biased against any person because of his or her race, ethnicity, national ancestry, religion, gender, sexual orientation, age, disability, or socioeconomic status. The parties did not mention defendant's sexual orientation during opening statements.

¶ 11       At the beginning of the trial, the State played a recording of a call N.N. placed from her cell phone to 911 on December 4, 2020. In the call, N.N. sounded out of breath. She said defendant and Justin tried to rape her in a room at the Quality Inn and she was running away from the hotel. During the call, defendant took the phone and identified herself as N.N.'s stepmother. Defendant told the operator N.N. was making a big deal out of nothing, nothing happened, and N.N. was just acting out. Defendant stated she had been giving N.N. a back massage, and N.N. was not getting her way about wanting to go somewhere and stormed out of the room. Defendant said she chased after N.N. to try to get her to come back inside.

¶ 12       Clayton Arnold, a lieutenant with the Bloomington Police Department, testified officers were dispatched at approximately 2 a.m. on the morning of December 4, 2020, based on N.N.'s report of a sexual assault. When Arnold arrived near the scene of the hotel, he observed N.N. sitting on the ground crying and speaking with Bloomington Police Officer Hector Melchor.

¶ 13       Arnold identified a video recording from Melchor's body camera. In the video, N.N. was crying, and Melchor stated he could see she was "highly upset." N.N. told Melchor Justin and defendant were giving her a back massage, and defendant started pulling her pants

- 3 -

down. She said both started touching her as she lay on her back with a stuffed animal over her face. She also said Justin tried to rape her. When defendant and Justin briefly stopped, N.N. took the opportunity to get her clothes on, grab her phone, run out the door, and call 911. She said she left without her shoes because she had to get away as soon as possible and defendant was chasing her. N.N. told Melchor she was 14 and took the medications Geodon and Lexapro.

¶ 14 Arnold testified he went to the Quality Inn to talk to Justin. Justin seemed fidgety, his demeanor was odd, and his speech was difficult to understand. Thus, Arnold believed Justin was under the influence of something. Justin's demeanor also did not change when he was informed of the allegations, which was out of the ordinary.

¶ 15 Arnold spoke to defendant, who admitted giving N.N. a back rub and touching her back, arms, legs, and feet. Defendant said N.N. had earlier wanted to go visit a boy, who was later identified at trial as A.D., and was upset when told no. Defendant said when N.N. did not get her way, she would have an outburst of bad behavior.

¶ 16 Arnold identified a video recording taken from his body camera inside the hotel after defendant and N.N. returned to the scene. In the video, Arnold asked N.N. what other options they had for the night and asked if N.N. wanted to talk to Justin. Defendant said N.N. should return to the room, lie down, and go to sleep. N.N., crying, said, "[H]e touched me." When defendant said they had just been giving N.N. a back rub, N.N. forcefully said, "[T]hat's not what that was, you don't give back rubs right there."

¶ 17 Arnold testified arrangements were made for N.N. to stay with her older sister that night. Having heard allegations regarding both Justin and defendant, Arnold sought to have N.N. interviewed by the Children's Advocacy Center, see if she would agree to a

sexual-assault-collection kit, and sought to contact the Illinois Department of Children and Family Services to make sure they were okay with N.N. being placed with her sister.

¶ 18 Alyssa N., N.N.'s older sister, testified she went to the hotel, picked up N.N., and took her to the hospital to undergo a sexual-assault kit. Alyssa described N.N. as upset and "kind of like she was in shock." The parties stipulated to lab results from the testing. The sexual-assault-kit test was negative, except that DNA from Justin N. could not be excluded from a profile obtained from swabbing N.N.'s underwear. N.N.'s toxicology screen was negative for drugs and alcohol.

¶ 19 A.D. testified he had been dating N.N. on December 4, 2020, and they did not have any plans to meet on that night. He said N.N. would not normally come over without them having plans. He further testified he lived about a 20-minute car ride away and it was too far to walk or bike there from Bloomington.

¶ 20 N.N. testified she had not lived with Justin since she was 11 years old, but she occasionally spent the night with him and defendant. At the time of the trial, N.N. was living with her brother. In December 2020, N.N. lived with Alyssa, and she was planning to move to Tennessee to be with her mother.

¶ 21 N.N. testified she was undergoing mental-health treatment, and, in December 2020, she had diagnoses of major depressive disorder and generalized anxiety disorder. She was later diagnosed with posttraumatic stress disorder (PTSD). In December 2020, N.N. was taking Lexapro and Geodon daily. She occasionally missed a dose, but she only felt the effects if she missed them for a significant period of time. N.N. testified she was able to tell the difference between fantasy and reality on December 4, 2020, and there had never been a time when she could not tell the difference between fantasy and reality.

¶ 22　　　　N.N. testified she had plans on December 3, 2020, to spend an overnight at the hotel with Justin and defendant as a going away party before she moved to Tennessee. She did not have plans to go anywhere else that night. Justin and defendant picked her up, and they spent time together hanging out, joking around, customizing clothing for a doll, and playing with her cat. They originally planned to swim in the hotel pool, but it was closed. Defendant and Justin purchased a bra and underwear she could wear for swimming, which N.N. tried on at the hotel while defendant was in the bathroom with her.

¶ 23　　　　N.N. testified defendant tried to get her to drink some alcohol, but N.N. did not like it and just had a sip. N.N. said the group also had marijuana at the hotel, and all three of them smoked it. N.N. testified she lay down to go to sleep around 11 p.m. wearing a hoodie, sweatpants, bra, and underwear. Justin and defendant were massaging and scratching N.N.'s back, which was something they normally did to help her calm down. At some point, defendant went to McDonald's to get a drink. N.N. testified Justin then rubbed her back further down and lifted her pants a bit, trying to touch her butt. N.N. pulled her pants back up and went to sleep. N.N. woke up when defendant returned to the hotel room. Defendant gave N.N. a drink, but it tasted like alcohol, so N.N. did not have more than a sip. Defendant tried to pressure N.N. into drinking it, but N.N. refused and tried to go back to sleep.

¶ 24　　　　N.N. testified Justin and defendant resumed rubbing her back, which N.N. said "was pretty typical." Defendant told N.N. to roll onto her back so defendant could rub her belly, and N.N. complied. N.N. had her eyes closed and a stuffed animal over her face, which was also normal for her. However, defendant then started moving her hands under N.N.'s bra and shirt and rubbed her breasts. N.N. said she did not react. N.N. testified defendant then removed her bra and hoodie, put her hands in N.N.'s pants and under her underwear, and touched the inside

- 6 -

and outside of N.N.'s vagina, with her fingers moving in and out. N.N. initially felt only defendant's hands, but she then heard Justin walk over and, with her underwear pulled down, he started touching her vagina with his mouth and tongue. She knew it was Justin because she could feel his beard. Both Justin and defendant then walked away. N.N. testified she then realized what was happening and was able to react.

¶ 25 N.N. testified she was in a "complete state of panic," got up, put on her clothes, grabbed her phone and keycard, and ran out of the hotel and down the street. While she was running, N.N. called 911 and heard defendant calling her name and chasing her.

¶ 26 On cross-examination, N.N. denied a symptom of her mental-health conditions was difficulty telling reality from fantasy. N.N. admitted she had some hallucinations and delusions, such as seeing colors on a wall, but she said she could always distinguish what was real and what was not. She likened her "delusions" to anxiety, where she would worry about unrealistic things or be mistrustful of people. N.N. said she still had symptoms even with medication but agreed the medication "took a little bit of the edge off."

¶ 27 The defense introduced N.N.'s medical records, including records from April 20, 2020, which included a scale rating her "extremely severe" for peculiar fantasies, indicating she was often absorbed in elaborate fantasies and had a difficult time distinguishing reality from fantasy. She also had an "extremely severe" rating for the delusions category, indicating she mistrusted or was suspicious of everyone or everything and could not distinguish reality from fantasy. She further had an "extremely severe" rating for hallucinations, indicating she constantly experienced auditory hallucinations in the form of commanding voices and visual hallucinations. Her depression diagnosis was described as recurrent major depressive disorder

with psychotic features. N.N. said that diagnosis was not what she was told, but she acknowledged it was what was written in her records.

¶ 28 On redirect examination, N.N. denied hearing commanding voices but admitted she previously told her sister there were a few people living inside her. N.N. also admitted that, on December 4, 2020, she had missed one dose of her medication and possibly had missed two days. She said she had heightened anxiety and was a bit paranoid before going to the hotel that day. N.N. acknowledged she did not tell the hospital that night about smoking marijuana and had mentioned being offered alcohol only one time. N.N. told the hospital employees her hoodie was removed during the incident and testified on cross-examination it was possible her bra was not actually removed but was instead pushed up.

¶ 29 N.N. testified the "extremely severe" ratings in her medical records were made by psychiatric evaluators. They were not her own subjective ratings, and she did not report to psychiatric evaluators having difficulty distinguishing fantasy from reality. She said she tended to get lost in thought and had delusions, such as wondering whether a cheeseburger that seemed different was tainted. N.N. said that was different from knowing there was something in the McDonald's drink on December 4, 2020, because with the burger, she knew there was not really anything wrong with it. She admitted hearing voices but said they were conversational rather than commanding. She also acknowledged having visual hallucinations of seeing spots of color on the wall but knew those were not real. N.N. stated none of her mental-health issues altered her sense of reality. When asked if it was possible parts of her memory were imagined, she stated, "I just really don't see how that would have happened," and, "It never happened at any point in my life before that I had experienced something that day that wasn't real."

¶ 30    Curt Maas, a detective with the Bloomington Police Department, testified he obtained surveillance-camera video from the hotel and identified an exhibit of the video. He also conducted interviews with Justin and defendant, who initially seemed hesitant to do so.

¶ 31    Excerpts of the surveillance video showed defendant leaving the hotel to buy a drink from McDonalds, N.N. running out of the hotel with defendant chasing her, and N.N. and defendant running outside the hotel down the street.

¶ 32    When the State sought to admit Maas's video interview of defendant, defense counsel objected, stating he had never been given a redacted version and was under the impression the State would not be using the video at trial. The trial court gave defense counsel a chance to preview the proposed exhibit. After viewing the video, defense counsel objected to the jury hearing defendant's statement in the video identifying herself as bisexual. Counsel argued the reference to her sexuality should be redacted and was overly prejudicial. Counsel further stated:

> "I think it is inappropriate to equate sexual orientation with sexual decency. They are saying that because she is bi-sexual, it is likely that she is attracted to minors who are young adolescent, or even pre-pubescent. I don't see that. I think that is crossing a different line. There has been no propensity motion, nothing like that."

The State argued the reference was relevant but did not specifically name a purpose for the reference, such as to show intent, motive, or lack of mistake. Instead, the State told the court, "She is charged and accused of committing sexual crimes on a female with a male present. Whether or not she is a bi-sexual is relevant as to whether or not she would commit these crimes." The court overruled the objection, finding the material relevant, stating, "The Court

- 9 -

agrees with the State, including this potentially could have happened based upon the answer that was given." The court did not specifically discuss whether the evidence was overly prejudicial.

¶ 33     Maas testified defendant was cooperative, gave a voluntary statement, and submitted to genetic testing. In the interview, defendant denied any inappropriate sexual contact occurred. Defendant told Maas N.N. was very disappointed when they found out the hotel pool was closed and N.N. remained in "a funk" that night. Defendant said N.N. normally loved having her back scratched, so defendant began massaging and scratching N.N.'s back, head, shoulders, arms, and sides. Justin also participated in massaging N.N.'s feet and back. Early in the interview, defendant stated N.N. was wearing a T-shirt and "regular jeans."

¶ 34     According to defendant, around 1:30 a.m., N.N. asked if they could go somewhere else, such as to see A.D. in another town. Defendant told her it was too late to go out, and N.N. started getting "major attitude" and began acting out, which she had done in the past. Defendant described other incidents where N.N. did not get her way and had run away and invented stories about someone hurting her. Defendant said it was not unusual for N.N. to run out the door and "make a big dramatic scene." When Maas suggested the "whole thing" was perhaps because defendant told N.N. they were not going to go see A.D., defendant agreed that was the case.

¶ 35     Defendant stated she drank a vanilla vodka cocktail that night, and Justin had a vodka cocktail and beer. Defendant also put vodka in her sweet tea that she bought at McDonald's and might have had a shot of vodka. She denied giving alcohol to N.N. or having marijuana.

¶ 36     In the middle of the interview, Maas told defendant he was going to ask some questions or have a candid conversation about sexual orientation or body parts. He then asked

defendant her sexual orientation, and defendant stated she was bisexual. There was a redaction or change in camera angle before defendant's answer and a redaction right after, which potentially made the question and answer stand out because of the change in the video before defendant's answer and the pause after that section of the video.

¶ 37 Approximately a minute and a half later in the video, defendant stated she had massaged the side of N.N.'s torso and may have accidentally touched the side of N.N.'s breast. Defendant said that was when N.N. jumped up, put on her hoodie, and ran out the door. She later agreed that was the "triggering event" that made N.N. run out of the room. However, defendant also repeated she thought N.N. made the whole thing up because she was mad about not getting to go see A.D.

¶ 38 Maas asked defendant to describe N.N.'s clothes, and defendant said N.N. was wearing a black halter top or sports bra, boy shorts, and black sweatpants. Defendant said she massaged under the band of N.N.'s bra, which had been irritating N.N.'s skin, but she did not otherwise place her hand under the bra. With N.N.'s permission, she had also rolled down N.N.'s waistband to massage her lower back and belly, but she did not move her hand into N.N.'s underwear or touch her vagina.

¶ 39 Defendant testified she previously saw N.N. on a regular basis and was often involved in taking her to doctor's appointments and making sure she took her medications. Defendant said when N.N. did not take her medications, she would get frustrated easily and exhibit extreme anxiety and paranoia. According to defendant, when they arrived at the hotel that evening, N.N. was acting fearful and paranoid. Defendant said N.N. normally took medications both morning and night and that she knew N.N. did not take her night medication at

the hotel because no pills were sent with them. Defendant did not mention N.N.'s paranoia in her video interview because she was not asked about it.

¶ 40          Defendant testified N.N. had forgotten to pack a bra and underwear, and Justin went back in the house to retrieve those. Defendant said she chased N.N. when she ran from the hotel because she was worried about her safety. Defendant acknowledged she had prior convictions for forgery and theft and stated she had taken responsibility for her actions in those cases and pleaded guilty to both.

¶ 41          Officer Melchor testified he briefly glanced at the hotel room on December 4, 2020, and saw no drugs or signs of a struggle. When Melchor spoke with N.N. around 2 a.m., she indicated the last time she took her medication was on December 2, 2020. In a video clip from his body camera, another officer asked Melchor if N.N.'s allegations were increasingly getting worse, and Melchor responded "yes." The parties stipulated Bloomington Police Officer J. Freeman would testify that, when he arrived at the scene, an adult was waving an arm in the air, and upon locating them, defendant appeared to be leaning over N.N. rubbing her upper back.

¶ 42          Neither party mentioned defendant's sexual orientation in closing arguments, although defense counsel reminded the jury it must not be biased in favor or against any person because of his or her race, ethnicity, national ancestry, religion, gender, sexual orientation, age, disability, or socioeconomic status. Although there was evidence suggesting defendant may have accidentally touched the side of N.N.'s breasts, defendant did not specifically raise inadvertent touching as a defense. Instead, defendant focused primarily on the theory N.N. lacked credibility because of her mental-health issues.

¶ 43          The trial court instructed the jury, "Neither sympathy nor prejudice should influence you. You should not be influenced by any person's race, ethnicity, national ancestry,

religion, gender, sexual orientation, age, disability, or socioeconomic status." The trial court also gave the jury the following instruction:

> "We all have feelings, assumptions, perceptions, fears, and stereotypes about others. Some biases we are aware of and others we might not fully be aware of which is why they are called implicit biases or unconscious biases.
>
> Our biases often affect how we act favorably or unfavorably towards someone. Bias can also affect our thoughts, how we remember, what we see and hear, whom we believe or disbelieve, and how we make important decisions.
>
> As jurors you are being asked to make very important decisions in this case. You must resist jumping to conclusions based upon personal likes or dislikes. You must not let bias, prejudice, or public opinion influence your decision."

¶ 44 The jury found defendant guilty of all four counts of aggravated criminal sexual abuse and not guilty of the three counts of criminal sexual assault. Defense counsel moved for a judgment of acquittal notwithstanding the verdict or a new trial, arguing, in part, it was error under *Stowe* to allow the jury to hear evidence defendant was bisexual. In response, the State again argued defendant's bisexuality made it more probable that she would commit sexual acts on N.N., who was also female. The trial court denied the motion.

¶ 45                                    B. Sentencing

¶ 46 On February 21, 2023, the trial court held a sentencing hearing. The presentence investigation report showed defendant had numerous prior nonviolent felony convictions. At the time of the offense, she was on probation for manufacture or delivery of a narcotic. She also had

multiple felony convictions for forgery, retail theft, and theft. Her longest previous prison sentence was four years.

¶ 47   Defendant had four children with her previous husband, whom she described as sexually, physically, emotionally, and mentally abusive. Her children lived with her parents in Bloomington. Defendant described her relationship with her children as strained, which she attributed to her struggle with addiction and being in and out of prison. Two of her children received disability benefits, one for bipolar disorder and the other for autism.

¶ 48   Defendant reported having been sexually abused for many years by two different male relatives when she was a child. She suffered from a number of mental-health issues and had attempted suicide multiple times. Her most recent diagnoses included bipolar disorder, depression, PTSD, substance use disorder, and borderline personality disorder. Defendant had a long history of abusing alcohol and underwent drug treatment from 2008 to 2009 and in 2013. She had been prematurely discharged from drug court probation after being arrested for theft and sentenced to incarceration. Just before her arrest in 2021, defendant used cannabis, cocaine, crack, and methamphetamine.

¶ 49   While awaiting trial, defendant participated in alcohol and drug treatment programs and a "Job Partnership." Defendant declined to make an in-court statement in allocution, but she provided a written statement in which she characterized her arrest as a rescue from drugs and from herself. She wrote she had spent her time in jail participating in programs, working on self-improvement with her counselor, consistently taking her medications, and working on healing the sexual and physical trauma of her past. Defendant expressed regret for things she did in the midst of her addiction and acknowledged her behavior had adversely affected her loved ones. However, she maintained her innocence of the charges. Defendant

provided letters of support from her parents, individuals in jail who viewed her as a friend and mentor, and from the director of a bible-study correspondence course.

¶ 50    In mitigation, defense counsel argued the jury's split verdicts showed uncertainty about what actually transpired, and defendant's statement to the detective about possibly accidentally touching N.N.'s breast showed she did not contemplate that her conduct would threaten serious physical harm. Defense counsel argued defendant cooperated in the investigation and had no violent criminal history, including no allegations of domestic violence, and she had children who would be negatively impacted by her incarceration.

¶ 51    The State presented victim impact statements from N.N. and her mother describing the emotional trauma caused by the abuse. The State argued defendant blamed her addiction to drugs or alcohol for her actions, making them aggravating factors. The State also argued in aggravation the trial evidence showed defendant was in a position of trust and authority, in that she was N.N.'s stepmother, was entrusted with N.N.'s care and supervision for periods of time, helped N.N. adhere to her medication schedule, and was involved in taking N.N. to and from appointments. The State sought consecutive sentences and extended-term sentencing based on defendant's criminal record.

¶ 52    The trial court stated it considered the totality of circumstances, including the relevant statutory factors in aggravation and mitigation, the victim impact statements, the letters of support, the role of defendant's substance-abuse and mental-health issues, the proactive steps she took in jail, and the trauma she suffered in childhood. The court considered in aggravation that defendant's conduct caused significant harm to N.N. based on N.N.'s trial testimony and the victim impact statements. The court also considered defendant's criminal history, describing it as nonviolent but extensive. The court also noted defendant had previously been given

opportunities at probation and was on probation at the time of the offenses. The court further considered the role of deterrence. Finally, the court considered in aggravation defendant's position of trust relative to N.N., stating:

"And the court is likewise looking at position of trust over the victim in this case. You were in a position of trust. This was a young lady who trusted you to do the right thing for her and that trust was violated in the worst possible way. And that is very aggravating to the court."

Defense counsel did not object.

¶ 53        The trial court, applying the totality of the circumstances, sentenced defendant to concurrent extended terms of 14 years in prison on each of the two counts of aggravated criminal sexual abuse by a person in a position of trust, authority, or supervision. The court merged the remaining counts. Defense counsel did not file a motion to reconsider the sentence.

¶ 54        This appeal followed.

¶ 55                                II. ANALYSIS

¶ 56        On appeal, defendant contends the trial court erred when it (1) allowed the jury to hear evidence of her sexual orientation and (2) considered a factor inherent in the offense in aggravation at sentencing, resulting in a double enhancement.

¶ 57        Defendant first contends the trial court erred in allowing the jury to hear evidence she was bisexual. In particular, relying on *Stowe*, defendant argues her sexual orientation was not relevant and was unduly prejudicial. She then argues the error was not harmless.

¶ 58                                A. Relevance

¶ 59 "All relevant evidence is admissible (Ill. R. Evid. 402 (eff. Jan. 1, 2011)), but the State bears the burden of demonstrating the admissibility of evidence it offers." *Stowe*, 2022 IL App (2d) 210296, ¶ 50. "[E]vidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " (Emphases omitted.) *Stowe*, 2022 IL App (2d) 210296, ¶ 50 (quoting Ill. R. Evid. 401 (eff. Jan. 1, 2011)).

¶ 60 "Relevant evidence may be excluded, however, if its probative value is substantially outweighed by the danger of unfair prejudice or confusion of the issues." *Stowe*, 2022 IL App (2d) 210296, ¶ 51 (quoting Ill. R. Evid. 403 (eff. Jan. 1, 2011)). Evidence is unduly prejudicial when it casts a negative light on the defendant for reasons having nothing to do with the case on trial or invites the jury to decide the case on an improper basis, commonly an emotional one, such as sympathy, hatred, contempt, or horror. *Stowe*, 2022 IL App (2d) 210296, ¶ 51; *People v. Romanowski*, 2016 IL App (1st) 142360, ¶ 30, 61 N.E.3d 999.

¶ 61 The trial court's admission of evidence is reviewed for an abuse of discretion. *Stowe*, 2022 IL App (2d) 210296, ¶ 51. A trial court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable. *Stowe*, 2022 IL App (2d) 210296, ¶ 51.

¶ 62 In *Stowe*, the defendant was charged with criminal sexual abuse and aggravated criminal sexual abuse based on allegations he sexually abused a 14-year-old autistic boy who was a resident of a care facility where the defendant worked. Before trial, the court granted the State's motion *in limine* to introduce evidence of two images found on the defendant's cell phone of an adult nude man with an erection. The State argued the images were relevant to establish the defendant's intent to commit the alleged conduct for sexual gratification or arousal and to disprove any claim his conduct was accidental or inadvertent. At the hearing on the motion the

State argued the images were evidence of defendant's sexual proclivities and relevant to prove intent, motive, and lack of mistake. The court granted the motion, stating, "It's in regard to a proclivity, essentially is what it amounts to." *Stowe*, 2022 IL App (2d) 210296, ¶ 10. The court also noted there was some prejudice involved but not enough to overcome the relevancy of the images.

¶ 63            At trial, the evidence was largely based on the testimony of a supervisor at the care facility, who briefly saw the defendant masturbating the boy when she opened a bathroom door to ask the defendant for a key that she needed. The defendant denied the allegations. He testified he was helping the boy change after the boy had soiled himself. The defendant testified the boy began to masturbate while defendant was assisting him, and the defendant noticed a mark on the boy's penis. The defendant said he tried to get a look at the mark when the supervisor opened the door. The defendant testified he was a married heterosexual and was not attracted to men. *Stowe*, 2022 IL App (2d) 210296, ¶ 39. During closing arguments, the State told the jury the images were relevant because defendant was accused of sexually abusing another male and he had images of a nude man with an erection on his phone. The State told the jury, "[D]oes this make it more or less likely that he was masturbating a child? It doesn't hurt. Right?" *Stowe*, 2022 IL App (2d) 210296, ¶ 44. The trial court did not give a limiting instruction specifically regarding the evidence.

¶ 64            On appeal, the Second District reversed. *Stowe*, 2022 IL App (2d) 210296, ¶ 84. First, the court found evidence of sexual orientation was not relevant to the determination of whether the defendant was sexually attracted to children. In particular, the court held the images "were, at best, probative of sexual attraction to a class of adults, and the State offered no evidence to support the further inference that sexual attraction to that class of adults is probative

- 18 -

of sexual attraction to children of any kind." *Stowe*, 2022 IL App (2d) 210296, ¶ 60. The court also took issue with the State's use of the evidence in closing argument, finding the argument could be read as directly equating same-sex attraction to men with a propensity to sexually abuse children when such an assertion was otherwise unsupported by any evidence in the record. *Stowe*, 2022 IL App (2d) 210296, ¶ 61.

¶ 65 The court distinguished cases involving evidence a defendant had sexual attraction to children. *Stowe*, 2022 IL App (2d) 210296, ¶¶ 59-60. The court also distinguished *People v. Wilson*, 214 Ill. 2d 127, 824 N.E.2d 191, 197-98 (2005), a case not involving issues of sexual orientation and in which our supreme court explained that other-acts evidence was permissible to rebut a defense theory the defendant was " 'the kind of person that touches people' " and that, " 'even if there was contact with the victims, it was merely incidental contact and not for sexual arousal.' " *Stowe*, 2022 IL App (2d) 210296, ¶ 64 (quoting *Wilson*, 214 Ill. 2d at 138, 824 N.E.2d at 197-98). There, our supreme court explained, " 'defense counsel raised motive, intent and the possibility that any of the complained-of touching was inadvertent in such a way that the jury could acquit defendant even if it believed that he actually touched the victims' breasts.' " *Stowe*, 2022 IL App (2d) 210296, ¶ 64 (quoting *Wilson*, 214 Ill. 2d at138, 824 N.E.2d at 198). In *Stowe*, however, the defendant did not claim he touched the boy inadvertently and denied touching the boy's penis altogether. The court then stated, "While the State was obligated to prove that defendant's touching was for sexual arousal or gratification, evidence that defendant had photos of two adult males was not relevant under the facts of the case to prove this proposition." *Stowe*, 2022 IL App (2d) 210296, ¶ 64.

¶ 66    The *Stowe* court relied in part on cases from other jurisdictions to support its holding the evidence was irrelevant. See *Stowe*, 2022 IL App (2d) 210296, ¶ 65 (citing cases). One of those cases is also particularly applicable here.

¶ 67    In *People v. Garcia*, 229 Cal. App. 4th 302, 177 Cal. Rptr. 3d 231 (2014), the female defendant was charged with sexually abusing a girl she babysat. The trial court limited the prosecution's ability to elicit testimony the defendant was a lesbian. However, during trial, the prosecution repeatedly attempted to bring the defendant's sexual orientation to light, and the court denied the defendant's motions for a mistrial. The prosecution then specifically told the jury in closing arguments the defendant was sexually attracted to women. The court instructed the jury arguments were not evidence and instructed the jurors they were not to let bias, including bias based on sexual orientation, influence their decision. The jury found the defendant guilty, and she appealed. *Garcia*, 229 Cal. App. 4th at 310, 177 Cal. Rptr. 3d at 237-38.

¶ 68    On appeal, the California Court of Appeals held the defendant's sexual orientation had "no logical bearing" on the determination whether she was guilty of sexually abusing a child. *Garcia*, 229 Cal. App. 4th at 311, 177 Cal. Rptr. 3d at 238. In particular, the court rejected arguments that the defendant's sexual orientation was relevant to prove intent or motive. The court noted the prosecution essentially told the jury the reason the defendant victimized the child was because she was gay. The court then stated, "We have grown beyond that notion. '[T]he modern understanding of pedophilia is that it exists wholly independently from homosexuality. The existence or absence of one neither establishes nor disproves the other.' " *Garcia*, 229 Cal. App. 4th at 313, 177 Cal. Rptr. 3d at 240 (quoting *State v. Crotts*, 104 Ohio St. 3d 432, 820 N.E.2d 302, 306 (2004)). The court further stated, "[A] defendant's sexual attraction to adults of

the same sex has nothing to do with whether they are sexually attracted to children of the same sex." (Emphasis omitted.) *Garcia*, 229 Cal. App. 4th at 313, 177 Cal. Rptr. 3d at 240. The court additionally stated:

> "[W]e do not believe the evidence of appellant's sexual orientation was relevant to her prosecution. Period. Whether designed to show appellant's intent, motive or why she would select [the child] as a victim, the evidence, standing alone, simply did not hold up in terms of facilitating the jury's understanding of the case or 'having any tendency in reason' to prove a disputed fact of consequence to the determination of the action." (Internal quotation marks omitted.) *Garcia*, 229 Cal. App. 4th at 314, 177 Cal. Rptr. 3d at 241.

¶ 69 The majority of courts in other jurisdictions have likewise held a person's sexual orientation is irrelevant to the issue of whether that person would sexually abuse a child. See *Crotts*, 104 Ohio St. 3d at 434-35, 820 N.E.2d at 306; *State v. Bates*, 507 N.W.2d 847, 852 (Minn. App. 1993); *State v. Ellis*, 820 S.W.2d 699, 702 (Missouri App. 1991); *United States v. Gillespie*, 852 F.2d 475, 478 (9th Cir. 1988). However, two cases hold otherwise, but with no meaningful substantive analysis. *State v. Davis*, 1 Neb. App. 502, 513, 500 N.W.2d 852, 858-59 (1993) (stating bisexuality was relevant to show motive in a crime committed by a male on a male); *Williams v. State*, 204 Ga. App. 878, 879, 420 S.E.2d 781, 782-83 (1992) (stating the defendant's bisexuality was relevant to prove "intent, motive, plan, scheme and bent of mind").

¶ 70 Here, applying *Stowe* and the majority of cases from other jurisdictions, without evidence connecting defendant's sexual orientation to a sexual interest in children, her sexual orientation was irrelevant. The burden was on the State to establish the relevancy of the evidence, but the State provided nothing indicating defendant's bisexuality extended to anyone

other than adults. Further, the State never articulated any relevant use of the evidence other than the assumption a bisexual person would be more likely to commit a sex crime on a child of the same sex. For example, the State never suggested the evidence was relevant under *Wilson* to show absence of mistake. Even in its brief on appeal, the State does not articulate a specific relevant use of the evidence other than to state "[a]n offender's bisexuality is relevant where the victim was the subject of a homosexual act." The State then cites the Nebraska and Georgia cases holding such evidence is relevant to show intent, motive, or other similar factors. But as previously noted, those cases are in the minority and contain little to no substantive analysis.

¶ 71 The State also attempts to distinguish *Stowe* and *Garcia* on their facts. For example, *Stowe* involved physical evidence consisting of photographs, and both cases involved the use of the evidence in closing arguments. But the factual distinctions of those cases do not change the application of the overall holding of those cases that, without more, evidence of sexual orientation toward adults is irrelevant to whether an adult would sexually abuse a child. In that regard, the State also suggests *Stowe* be limited to cases involving prepubescent children. However, the victim in *Stowe* was not prepubescent. He was 14, the same age as N.N. here.

¶ 72 We find *Stowe* well-reasoned and applicable. Accordingly, under the circumstances of this case, evidence defendant was bisexual was irrelevant, and the trial court erred in allowing it. We further note, while we need not decide the matter, the court did not make any findings regarding the possibility the evidence was more prejudicial than probative, which would be problematic even if we were to find the evidence relevant. The next issue then is whether the error was harmless.

¶ 73 B. Harmless Error

¶ 74　　　　　　Defendant argues the error was not harmless. Meanwhile, the State contends it was harmless because the evidence consisted of a single mention of bisexuality, and the trial court gave limiting instructions.

¶ 75　　　　　　Where, as here, "the defendant has made a timely objection and properly preserved an error for review, the reviewing court conducts a harmless-error analysis in which the State has the burden of persuasion with respect to prejudice." *People v. McLaurin*, 235 Ill. 2d 478, 495, 922 N.E.2d 344, 355 (2009). "An evidentiary error is harmless if there is no reasonable probability the jury would have acquitted the defendant without the error." *Stowe*, 2022 IL App (2d) 210296, ¶ 68. When considering whether an error was harmless, this court "may (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *In re Rolandis G.*, 232 Ill. 2d 13, 43, 902 N.E.2d 600, 617 (2008).

¶ 76　　　　　　In *Stowe*, the appellate court found the error was not harmless. *Stowe*, 2022 IL App (2d) 210296, ¶ 80. The court noted the evidence against the defendant was not overwhelming and boiled down to a credibility contest between the supervisor and the defendant. The court further noted the jury was not provided a limiting instruction as to the purpose for which it could consider the photos. Thus, the court could not say there was no reasonable probability the jury would have acquitted defendant without the error. *Stowe*, 2022 IL App (2d) 210296, ¶ 80; see *Ellis*, 820 S.W.2d at 703 (finding error not harmless when the case was dependent on credibility determinations).

¶ 77        Courts have also rejected the argument a limiting instruction cures the error.  For example, in *Gillespie*, the Ninth Circuit noted "[e]vidence of homosexuality is extremely prejudicial." *Gillespie*, 852 F.2d at 479.  The court there found "unconvincing" the prosecution's argument admission of evidence of homosexuality was harmless because the trial court gave a limiting instruction. *Gillespie*, 852 F.2d at 479.  There, the case centered around the defendant's denial of eyewitness testimony.  The court found the verdict probably depended on the jury's assessment of the credibility and character of the defendant and the witness.  Under those circumstances, the court held a curative instruction to the jury was not sufficient to obviate the prejudice. *Gillespie*, 852 F.2d at 479.

¶ 78        Likewise, the *Garcia* court found the error was not harmless, but under circumstances different from the instant case.  Initially the court noted, had the issue of the defendant's sexual orientation been "left alone" after the initial reference, the court would have likely affirmed the conviction. *Garcia*, 229 Cal. App. 4th at 312, 177 Cal. Rptr. 3d at 239.  However, based on the cumulative exposure to the issue, the court found the defendant had been denied a fair trial.  The court acknowledged prejudice against homosexuals was "not as antithetical to a fair trial as it once was," but it also noted evidence and argument regarding the defendant's sexual orientation was still inflammatory. *Garcia*, 229 Cal. App. 4th at 315, 177 Cal. Rptr. 3d at 241-42.  The court then addressed the instruction on bias, stating:

> "To guard against the possibility that some of the jurors might harbor bias toward gays, the trial court admonished the jury on the point. [Citation].  We presume the jury followed this instruction in deciding the case. [Citation].  But that instruction only went so far.  It did not, as the Attorney General maintains, tell the jurors to disregard the issue of appellant's sexual orientation altogether.  And as it

turned out, that issue was kept alive by a confluence of factors." *Garcia*, 229 Cal. App. 4th at 315, 177 Cal. Rptr. 3d at 242.

¶ 79    The *Garcia* court found notable the prosecution, as a prominent component of its closing argument, wrongly told the jury the defendant's sexual orientation was relevant. The court found it was quite possible the closing argument confirmed preconceived notions the jury might have about the case. Thus, although it was not true, jurors may have suspected any woman who sexually abused a girl would have to be a lesbian or at least bisexual. Thus, given the emphasis on the issue in closing, the court found the error was not harmless. *Garcia*, 229 Cal. App. 4th at 317-18, 177 Cal. Rptr. 3d at 243-44. In comparison, an error in the admission of evidence of a defendant's sexual orientation has been found harmless when there was substantial evidence supporting the conviction. See *Bates*, 507 N.W.2d at 852.

¶ 80    Here, while we recognize the evidence was not as pervasive as it was in *Stowe* or *Garcia*, and it consisted of only a single instance, the State has not met its burden of persuasion to show the error was harmless. First, although the evidence consisted of a single question and answer in defendant's police interview, its topic was potentially inflammatory, and a camera angle change and redaction in the video particularly drew attention to it. In general, we do not conclude it is something the jury would easily overlook or disregard.

¶ 81    Next, as in *Stowe*, this was a close case, with the outcome depending on a credibility contest between defendant and N.N. While defendant exhibited inconsistencies in her interview and testimony that could undermine her credibility, N.N.'s credibility was also highly questionable based on her mental-health struggles. For example, eight months before the charged offenses, medical professionals rated N.N. as "extremely severe" for peculiar fantasies, indicating she was often absorbed in elaborate fantasies and had a difficult time distinguishing

reality from fantasy. N.N. admitted that, as of December 4, 2020, she had not taken her medication for one or two days, and she was feeling paranoid before going to the hotel. Melchor had also remarked N.N.'s allegations were increasingly getting worse as time went on. Given the closeness of the case, defendant's irrelevant statement that she was bisexual could have reasonably tipped the scale in favor of her conviction. The evidence was also not cumulative of other evidence at trial. Thus, when we (1) focus on the error to determine whether it might have contributed to the conviction, (2) examine the other properly admitted evidence to determine whether it overwhelmingly supported the conviction, and (3) determine whether the improperly admitted evidence was merely cumulative or duplicated properly admitted evidence, we determine the error was not harmless.

¶ 82          We also reject the State's argument the limiting instruction was curative. The trial court admonished the jury it was to not allow bias based on sexual orientation to influence its decision. The State, however, has wholly failed to address the more nuanced argument defendant raises, which is, independent of any bias, the jury, in the absence of a limiting instruction, was free to consider the evidence for an improper purpose. As illustrated in *Garcia*, the instruction given did not tell the jurors to disregard the issue of appellant's sexual orientation altogether. As the court noted in *Garcia*, although it was not true, jurors may have suspected any woman who sexually abused a girl would have to be a lesbian or at least bisexual. Thus, it is possible, while the jurors were not influenced by a general bias against defendant's bisexuality, they still wrongly believed defendant's sexual orientation made it more likely she would commit the crime when the victim was female. As previously discussed, the evidence was not relevant for that purpose, and the court's limiting instruction, which merely discussed bias in general, did not tell the jury it could not consider the evidence in that manner. Given the closeness of the

case, which amounted to a credibility contest, the jury's improperly drawing such an inference would be prejudicial to defendant. Under the circumstances of this case, a curative limiting instruction would have to tell the jury to disregard the evidence altogether.

¶ 83        Overall, in such a close case, the State has not convinced us there is no reasonable probability the jury would have acquitted defendant without the error. See *Stowe*, 2022 IL App (2d) 210296, ¶ 80. However, although we find the trial court erred in allowing the evidence of defendant's sexual orientation and the error was not harmless, we note defendant does not argue double jeopardy precludes retrial. We also find the evidence sufficient to sustain a conviction. Thus, defendant may be retried. See *Stowe*, 2022 IL App (2d) 210296, ¶ 82.

¶ 84        Because we reverse defendant's convictions, we need not discuss her argument she was subjected to an improper double enhancement when the trial court considered the fact she was in a position of authority, trust, or supervision over N.N. as both an element of the offenses and as a factor in aggravation. However, we note the court specifically found "very aggravating" defendant's position of trust, which was an element of the counts the court sentenced her on. On appeal, both parties discussed the effect of statutory changes and principles of statutory interpretation to address whether the legislature clearly intended to enhance the penalty for aggravated sexual abuse of child based on the element of a position of trust inherent in the crime. Although we express no view on the issue, if defendant is retried and convicted, the court should consider the double-enhancement question before applying defendant's position of trust as a factor in aggravation at sentencing.

¶ 85                            III. CONCLUSION

¶ 86        For the reasons stated, we reverse the trial court's judgment and remand for a new trial.

¶ 87          Reversed and remanded.